GARY M. RESTAINO
United States Attorney
District of Arizona
JOSEPH BOZDECH
California State Bar Number 303453
Assistant United States Attorney
Two Renaissance Square
40 North Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone: (602) 514-7500
Email: joseph.bozdech@usdoj.gov
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>    Plaintiff,<br><br>v.<br><br>2017 Ford Raptor<br>VIN: 1FTFW1RG5HFC59994,<br><br>    Defendant *In Rem*. | **VERIFIED COMPLAINT FOR FORFEITURE *IN REM*** |

   Plaintiff United States of America brings this Complaint and alleges as follows in accordance with Rule G(2) of the Federal Rules of Civil Procedure, Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions (Supplemental Rules):

### NATURE OF THE ACTION

   1. This is a civil action in rem to forfeit property to the United States pursuant to 21 U.S.C. § 881(a)(6) because it was furnished or intended to be furnished by a person in exchange for a controlled substance or listed chemical in violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*, or is proceeds traceable to such an exchange, or was used or intended to be used to facilitate a violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801 *et seq*.

   2. Venue and jurisdiction in Arizona are based upon 21 U.S.C. § 881(j) and 28 U.S.C. §§ 1355(b) and 1395 as acts and omissions occurred in the District of Arizona that

give rise to this forfeiture action. This Court has jurisdiction. 28 U.S.C. §§ 1345 and 1355; 18 U.S.C. § 981(h).

## THE DEFENDANT *IN REM*

3. The defendant *in rem* consists of the following property: 2017 Ford Raptor VIN: 1FTFW1RG5HFC59994 (the "defendant property"). The defendant property was seized on September 27, 2022 and is currently in the custody of the United States Marshals Service.

## INTRODUCTION

4. On September 27, 2022, Kevin Alejandro Nunez Rodriguez ("Rodriguez") was observed by Drug Enforcement Administration ("DEA") agents driving his 2017 Ford Raptor to a drug trafficking meeting with Martin Alexis Mendivil Perez ("Perez"). Surveillance was already being conducted on Perez and his 2018 Chevrolet Silverado because Perez had earlier agreed to coordinate and broker the sale of cocaine from a seller to a buyer.

5. After Rodriguez and Perez's meeting, each was stopped in their respective vehicles by law enforcement. Perez was found to have cocaine in his Silverado. Both Rodriguez and Perez admitted that Rodriguez had hand-delivered the cocaine to Perez from his 2017 Ford Raptor at their meeting moments earlier. Rodriguez admitted to transporting the cocaine to his meeting with Perez in the defendant property. Surveillance showed Perez intended to transport the cocaine he received from Rodriguez to another to complete the drug transaction.

## BACKGROUND

### *Drug Deal Preparation and Coordination*

6. On September 26, 2022, DEA Special Agent Lucas Hoss spoke to a confidential source ("CS-1") regarding a Phoenix-based cocaine distributor later identified as Perez. CS-1 then introduced a second confidential source ("CS-2) to Perez for the purpose of coordinating the delivery of five kilograms of cocaine the following day.

7. Perez' role was as a middleman. He was to be paid a small sum to arrange and coordinate the sale of cocaine between a willing buyer (who provided the money) and seller (who provided the drugs).

## Coordination with the Cocaine Buyer

8. Between September 26, 2022 and September 27, 2022, Perez and CS-2 had multiple telephonic conversations to coordinate and agree upon a meeting near 43rd Avenue and McDowell Road in Phoenix, Arizona.

9. The purpose of the initial meeting near 43rd Avenue and McDowell Road was to further discuss the details of the drug transaction in person.

10. On September 27, 2022, at approximately 10:45 a.m., CS-2 told Perez to meet at the Filiberto's restaurant at 4326 W. McDowell Road, Phoenix.

11. Based upon this information, surveillance was set up near this location by the DEA.

12. At approximately 11:20 a.m., CS-2 arrived at the location. About 30 minutes later, Perez arrived in his black 2018 Chevrolet Silverado and parked at a T-Mobile cell phone store at 4314 W. McDowell Road, Phoenix.

13. At this time, while Perez talked to CS-2 over the phone, Perez got out of his Silverado, walked to CS-2's vehicle, and got in the front passenger seat.

14. Through the use of audio and visual recording devices, DEA agents heard Perez and CS-2 discuss the five-kilogram drug transaction in detail. Perez insisted on verifying the presence of the money being exchanged for the drugs before proceeding. He also said the transaction would occur at 83rd Avenue and McDowell Road in Phoenix. CS-2 agreed to go and retrieve the money at a nearby location and then bring it back to Perez to see. At about 12 p.m., Perez walked back to his black Silverado and CS-2 left.

15. At approximately 12:15 p.m. CS-2 texted Perez and told him that he now had the money. Perez then texted CS-2 to meet at the Fry's grocery store across the street at 4230 W. McDowell Road. Shortly thereafter, Perez was observed driving his black Silverado from T-Mobile's parking lot to the Fry's parking lot.

3

16. Perez exited his Silverado and entered the back driver's side of CS-2's vehicle.

17. CS-2 showed Perez the money. The stacks of money provided by law enforcement to CS-2 were mostly fake. The top and bottom bills of each stack were real, but all the "bills" in between the two were not.

18. Immediately thereafter, Perez made a video call to an unknown male and showed him a stack of the fake money. Perez unwittingly used the fake money as a prop to convince the person on the video call that Perez had the funds to buy the cocaine from them.

19. Perez then got in his vehicle, left the area, and drove to 1709 S. 82nd Avenue, Phoenix, 85043. This address is shown as Perez' residence on his vehicle registration for the Silverado.

20. Perez went into his house and returned to the Silverado soon thereafter. Perez appeared to be making a call to someone on his cell phone.

21. At approximately 12:40 p.m., Perez contacted CS-1 on the phone to confirm that he had the money for the drug exchange because the deal with CS-2 was ready to be done in about an hour. Perez suspected the money CS-2 showed him may be fake. He knew it would be a big problem if someone tried to exchange drugs for fake money.

22. CS-1 assured Perez that the money CS-2 had was real.

23. At approximately 12:52 p.m., CS-2 received a call from Perez. Perez told CS-2 he would provide an address to meet for the drug deal.

24. At approximately 1:30 p.m., Perez called CS-2 again and asked if he wanted to meet at a gas station, Burger King, or a car wash. CS-2 said to meet at Burger King.

25. All three businesses are found near the intersection of 91st Avenue and McDowell Road in Phoenix.

### *Coordination with the Cocaine Seller*

26. Now that Perez had arranged for CS-2 to buy the drugs, he needed to pick up cocaine from his pre-arranged source and deliver the cocaine to CS-2.

27. At approximately 1:50 p.m., Perez parked at a Circle K gas station at 1609 N 91st Avenue, Phoenix and remained in his vehicle.

28. At approximately 2:06 p.m., a white Ford Raptor (the before-mentioned "defendant property") driven by Rodriguez parked next to Perez's black Silverado.

29. Rodriguez got out of the defendant property, entered the front passenger side of the black Silverado, and then left and got back in the defendant property.

30. At approximately 2:12 p.m., both vehicles then relocated to the adjacent parking lot at 1805 N. 91st Avenue, Phoenix, where they parked driver-side window to driver-side window.

31. At this time, Rodriguez gave Perez a one-kilogram brick of cocaine.

32. The two vehicles then separated and drove away.

33. Perez then drove to the pre-arranged spot nearby where he was going to exchange the kilogram of cocaine for U.S. currency with CS-2. When CS-2 was not there, Perez drove away.

### *Vehicle Stops*

34. At approximately 2:30 p.m., a DEA special agent made a traffic stop on Perez and his black Silverado near the corner of 91st Avenue and West Buckeye Road, Tolleson, Arizona, based upon probable cause that Perez was in possession of cocaine.

35. At approximately 2:35 p.m., Gila River Police Officer Shawn Pietrzak deployed his canine Kilo around the perimeter of the black Silverado. Kilo alerted to the presence of drugs on the right rear tire well as well as the rear passenger door of the vehicle.

36. About two minutes later, a DEA special agent found a brick of a white powder inside of a gray fabric bag under the backseat of the Silverado.

37. The white powder later tested positive as 1.317 kilograms of cocaine.

38. At about the same time as Perez's traffic stop, a DEA special agent made a traffic stop of the defendant property driven by Rodriguez at 8725 W. Lewis Avenue, Phoenix. Alvaro Rivera ("Rivera") was a passenger in the vehicle.

39. A search of Rodriguez revealed $1,350 in U.S. currency found in his pants pocket.

40. After Rodriguez gave the DEA special agent consent to search the defendant property, a pistol was found in the glove box. Rivera said that the pistol belonged to him.

41. According to DEA Special Agent Hoss, it is common for those involved in drug trafficking to possess weapons to protect their drugs, money, and themselves when conducting drug transactions.

42. Also, according to DEA Special Agent Hoss, it is common for those involved in drug trafficking to possess large amounts of cash to pay for illegal drugs or as receipt of payment for drugs.

43. Both Perez and Rodriguez were arrested.

44. Based upon the surveillance of Perez and Rodriguez' drug activity, as well as their later statements, the defendant property was seized on September 27, 2022.

### *Interview of Perez*

45. On September 27, 2022, DEA agents interviewed Perez after his traffic stop in which 1.317 kilograms of cocaine were found in his Silverado.

46. Perez claimed he did not know the names of the two individuals who delivered the kilogram of cocaine to him at the parking lot north of the Circle K at 91st Avenue and McDowell Road in Phoenix, or where the drugs originally came from.

47. Perez said he had not looked inside the bag that contained the cocaine. He said he met a man at a casino earlier who asked Perez if he could get cocaine for him. Perez said he wanted to make extra money selling cocaine to this man, so he called up acquaintances to find cocaine, and then an acquaintance put him in contact with the two men that delivered the cocaine to Perez.

6

### *Interview of Rodriguez*

48.  On September 27, 2022, DEA agents read Rodriguez his Miranda rights. Rodriguez said he understood his Miranda rights and agreed to answer their questions.

49.  Rodriguez said he currently owned and operated a residential and commercial painting business. Rodriguez said he has three employees and estimated that his net income was approximately $8,000 to $10,000 per month.

50.  Rodriguez was asked to detail the events that led to his traffic stop and arrest. Rodriguez said that Perez had messaged Luis Pimentel ("Pimentel") to coordinate the delivery of cocaine. Once this was done, a contact of Pimentel's drove a kilogram of cocaine to an apartment complex that Rodriguez and his crew were painting. Rodriguez said the unknown courier was driving an older model black vehicle.

51.  Once Rodriguez had the cocaine, he was told by Pimentel to deliver it to Perez.

52.  Rodriguez admitted that he met Perez at the Circle K parking lot at 1609 N. 91st Avenue, Phoenix, Arizona and discussed the pending drug transaction.

53.  Rodriguez said that Perez knew that he was going to be receiving a kilogram of cocaine from Rodriguez and that no money would be exchanged at that time.

54.  It was Rodriguez' understanding that payment would be handled by Perez and Pimentel after the sale.

55.  Rodriguez admitted that the cocaine was on the passenger seat of the defendant property when he provided it to Perez.

56.  Rodriguez said that Pimentel was the provider or source of the drugs and that Pimentel would have additional drugs in his possession. He said Pimentel lived in the area of Tolleson, Arizona, that he chatted with Pimentel though SnapChat, and that Pimentel's username is "Gallo." Rodriguez said he met Pimentel at a club and has known him for about two years.

57.  Rodriguez also provided DEA agents with Pimentel's SnapChat info as well as Pimentel's cell phone number.

58. A DEA agent showed Rodriguez a photograph and Rodriguez confirmed that it was Pimentel.

59. Rodriguez said it occurred a long time ago, but that he had done several drugs transactions with Pimentel in the past.

60. Rodriguez said that Rivera was not present during the drug transaction and was not associated with Pimentel or Perez.

### *Administrative Claim by Rodriguez*

61. On December 13, 2022, Rodriguez made an administrative claim to the defendant property. Rodriguez used the name of Keven Nunez Rodriguez in his claim, but law enforcement believes his full name is actually Kevin Alejandro Nunez Rodriguez.

62. Rodriguez' claim was 142 pages long and included:

   a. Standard Online Claim Form;

   b. 2021 Tax Returns;

   c. Home Mortgage Statement;

   d. Business Entity – Rodriguez Pro Painters, LLC printout;

   e. Lender car payment history – TD Auto Finance information.

63. Rodriguez stated the following in his claim:

> The court notified me that my case was not filed. There are no charges filed against me. -Primary mode of transportation used to for work -I work 6 days a week and travel daily for work, my truck is needed to pull a trailer with tools and materials needed. -I use my truck to pick up my employees daily for work -Type of work- painting contractor at Rodriguez Pro Painters LLC Entity ID #23166758 - Outstanding debt to TD Auto Finance Loan number #1103911533 -Primary vehicle for personal transportation Wife is pregnant with my son, this will be the main form of transportation for my child. This situation has caused unbearable stress to my wife and I. We are worried about the future impact of not having a vehicle and still being responsible for that debt. That vehicle is a symbol of years of hard work, at the time of purchase I traded in a prior vehicle that I still owed money on plus now have the added debt of the current truck. I rely on that vehicle to earn a living and maintain my home.

64. The bulk of Rodriguez' claim was made up of his 2021 Tax Return. It showed, among other things, that he made $50,510 net income from his business that year.

8

65. Rodriguez' December 5, 2022 home mortgage statement showed monthly payments of $2,702.93, and that he had made $16,209.24 in payments during 2022.

66. It appeared from this statement that Rodriguez began paying down this home mortgage about six months earlier.

67. Rodriguez' car payment history showed that from December 2021 to October 2022 he had been making monthly payments between $1,049.66 and $1,102.14 on the defendant property, or roughly $12,000 in all.

### *Further Investigation of Rodriguez*

68. An Arizona Department of Economic Security ("DES") wage inquiry showed that Rodriguez had no reported income in 2021, 2022, or 2023.

69. Wage reports from DES show reported income provided by employers of their employees in the state of Arizona. It may not, however, show Rodriguez' business income as the sole owner of his painting business.

70. According to DEA Special Agent Hoss, Rodriguez' reported 2021 income of $50,510 from his painting business, does not justify Rodriguez' relatively large monthly expenditures of approximately $3,800 for his vehicle and home, let alone additional living expenses for a family. DEA Special Agent Hoss believed it likely that Rodriguez was supplementing his painting business income by selling drugs.

71. Special Agent Hoss noted that during his earlier interview with Rodriguez, Rodriguez told him that his legitimate income was not enough. Special Agent Hoss believed that based upon this statement, Rodriguez was saying that he lived above his legitimate financial means, and that he could not afford his current lifestyle without his drug trafficking income to supplement his painting business.

72. A review of Rodriguez' SnapChat account on his cell phone showed what Special Agent Hoss believed were multiple messages to Pimentel and others in which Rodriguez was coordinating his drug delivery to Perez on September 27, 2022.

73. Also found on Rodriguez' SnapChat account was a video that showed packaged drugs, blue pills believed to be fentanyl, and bundles of currency.

74. Rodriguez was indicted on November 11, 2022 by the Superior Court of the State of Arizona for Conspiracy to Transport a Narcotic Drug (Cocaine) for Sale Over the Amount of the Statutory Threshold, Illegally Conducting an Enterprise, Transportation of a Narcotic Drug (Cocaine) for Sale Over the Statutory Threshold, and Misconduct Involving Weapons.

## **SUMMARY**

75. The defendant property facilitated drug trafficking, and/or was the proceeds of drug trafficking, for the following reasons:

    a. Investigation showed Perez brokered a cocaine transaction between multiple confidential sources and Rodriguez;

    b. Perez' interactions with the confidential sources for the purchase of cocaine from Rodriguez were surveilled by DEA agents;

    c. Perez told the confidential sources he was going to get cocaine from his supplier;

    d. Perez was observed moments later driving to and meeting with Rodriguez;

    e. Rodriguez drove to the drug delivery in the defendant property;

    f. Rodriguez admitted that he transported the cocaine to the meeting with Perez in the defendant property;

    g. Both Perez and Rodriguez admitted that Rodriguez gave Perez cocaine from the defendant property;

    h. Rodriguez admitted to assisting Pimentel with several drug transactions in the past;

    i. A relatively large sum of cash was found on Rodriguez' person;

    j. A weapon was found in the defendant property;

    k. Rodriguez lacked legitimate income to support his lifestyle;

    l. Rodriguez made statements in which he said his legitimate income was not enough;

  m. Rodriguez SnapChap account contained messages and pictures in which Rodriguez detailed drug trafficking with Pimentel, Perez, and others; and

  n. Rodriguez was recently indicted in the Superior Court of the State of Arizona for drug trafficking.

## CLAIM FOR RELIEF

The Defendant Property was furnished or intended to be furnished by a person in exchange for a controlled substance or listed chemical in violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801, *et seq.*, or is proceeds traceable to such an exchange, or was used or intended to be used to facilitate a violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801 et seq., and therefore is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) and 21 U.S.C. § 881(a)(6).

## PRAYER FOR RELIEF

WHEREFORE, the United States of America prays that process issue for an arrest warrant *in rem* issue for the arrest of the defendant property; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring the defendant property be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other and further relief as this Court deems just and proper, together with the costs and disbursements of this action.

Respectfully submitted this 13$^h$ day of March, 2023.

           GARY M. RESTAINO
           United States Attorney
           District of Arizona

           *S/Joseph Bozdech*
           JOSEPH BOZDECH
           Assistant United States Attorney